## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ANTHONY GREEN** | ) |
| **10600 TERRACO TERRACE** | ) |
| **CHELTENHAM, MD 20623** | ) |
| | ) |
| **Plaintiff,** | ) |
| | )   **Civil Action No.** |
| **v.** | ) |
| | ) |
| **THE ARCHITECT OF THE CAPITOL** | ) |
| **c/o General Counsel** | ) |
| **Ford House Office Building H2-265A** | ) |
| **Second and D Streets SW** | ) |
| **Washington, DC 20515** | ) |
| **Defendant.** | ) |

## COMPLAINT

Plaintiff, Anthony Green is a Maintenance Mechanic at the Architect of the Capitol's Capitol Power Plant Jurisdiction.  Since the time that he was hired, in 2015, Mr. Green was treated differently because he was African American.  Mr. Green has been subjected to different working conditions than those of his white colleagues. He has been required to do "dirty jobs" and has been referred to as "lazy" and a "nigger."  Plaintiff also found a noose hanging from equipment that he was assigned to inspect.  After he complained about the hostile conduct, the Architect failed to take prompt action to stop the harassment and it began retaliating against.  Among other things, a new Assistant Supervisor has engaged in intimidating conduct and unjustified discipline and threatened future threatened disciplinary action.

## <u>JURISDICTION</u>

1.   Plaintiff invokes the jurisdiction of this Court pursuant to the Congressional Accountability Act of 1995 (2 U.S.C. §1408 (a)), as well as 28 U.S.C. § 1331 (Federal Question).

2. This is an action authorized and instituted pursuant to the Congressional Accountability Act, as amended by the Reform Act of 2019 (2 U.S.C. § 1301 et seq.).

3. The unlawful employment practices alleged in this Complaint were committed in the District of Columbia.

4. Plaintiff is a current employee of the Architect of the Capitol.

5. Defendant Architect of the Capitol (hereinafter "Architect" or "AOC") is an "Employing Office" covered by the Congressional Accountability Act (2 U.S.C. § 1301(9)(D)).

6. AOC is headquartered in the District of Columbia.

7. The Congressional Accountability Act, 2 U.S.C. § 1311(a)(1), mandates that "all personnel actions affecting covered employees shall be made free from any discrimination based on … race".

8. The Congressional Accountability Act, at 2 U.S.C. § 1317, makes it unlawful for the Architect to retaliate against employees who have either opposed discrimination that violates the Congressional Accountability Act or who have filed claims of discrimination with the Office of Compliance (now known as the Office of Congressional Workplace Rights).

9. Plaintiff has satisfied all administrative and judicial prerequisites to the institution of this action. The Plaintiff filed a timely Complaint with the Office of Congressional Workplace Rights (OCWR) on November 26, 2019, prior to filing this Civil Action.  Plaintiff's OCWR Complaint raised the discriminatory and retaliatory hostile work environment claims raised herein.  This suit is filed within the 70 day deadline measured from the date that Plaintiff filed her Complaint with the OCWR as required by 2 U.S.C. § 1401(b)(3).

## FACTS

10. Plaintiff is currently employed as an WG-12 Maintenance Mechanic at the Architect

of the Capitol, in the Capitol Power Plant Jurisdiction.

11. Plaintiff began his employment at the Architect in January 2015.

12. Initially, Plaintiff's first line supervisor was Assistant Supervisor Victor Shaw, and the Supervisor position was vacant.  Mr. Shaw later became the Supervisor in mid 2015.

13. Both as Assistant Supervisor and then Supervisor Mr. Shaw reported directly to the Maintenance Mechanic General Supervisor, who at all relevant times has been James Burch.

14. Between January 2015 and mid-2016, Randy Charity was the Mechanic Work Leader. Mr. Charity was promoted to Assistant Supervisor in mid-2016.  When Mr. Charity was promoted from Leader to Assistant Supervisor, Quinton Coleman was promoted to the Leader position.

15. Mr. Green was not trained how to log his completed work orders into the computerized system until October 2015.  During that period of time, Mr. Shaw regularly failed to credit Mr. Green for the tasks on which he worked or contributed.

16. Because his project completion was not tracked on the computer and in regular reports, Plaintiff's evaluations suffered and his white counterparts have received more monetary awards (such as spot awards), more performance awards (monetary awards or step increases given for Outstanding performance) and higher performance appraisals than he has.

17. At work, Victor Shaw was close friends with three of the other Mechanics, Mechanic Leader Quinton Coleman, and Mechanics Dana Spencer and David Barletta. Shaw, Spencer and Barletta are all white. Although Coleman is African American, he always aligned himself with employees who discriminated against other African Americans.

18. Shaw, Coleman, Spencer and Barletta, as a cohort, openly spoke poorly, and in racially charged terms, about Mr. Green and another African American mechanic. The four

referred to Plaintiff as a "nigger" when speaking to other AOC employees.

19. Shaw, Coleman, Spencer and Barletta falsely claimed that Mr. Green and another African American mechanic worked more slowly than the other mechanics in the shop, that their work was of an inferior quality than the other mechanics, and that the African American employees were "lazy."

20. Mr. Shaw openly told other AOC employees that Mr. Green should never have been hired as a Maintenance Mechanic, despite the fact that Mr. Green is well qualified, has a mechanical engineering degree and has numerous HVAC mechanic certifications. On information and belief, Mr. Shaw was telling others that Mr. Green only got the job because Mr. Green is African American and because an African American supervisor (Andy Howard) had intervened on Plaintiff's behalf to get the job.

21. Mr. Shaw also openly told other mechanics that Mr. Green would not survive the probationary period, despite Mr. Green's obvious skills and good work performance. On information and belief, Mr. Shaw was attempting to lay the groundwork to terminate Mr. Green during his probationary period because of his race.

22. In July 2015, after Mr. Green received a puncture wound at work, for which he sought treatment. Out of discriminatory animus toward Mr. Green, Mr. Shaw told other AOC employees that Mr. Green was going to take advantage of the situation and would likely claim 45 days of injury leave.

23. Shaw, Coleman, Spencer and Barletta also caused problems for Mr. Green and the other African American mechanic by falsely accusing them of wrongdoing at work. For instance, on at least two instances in January 2016 Barletta and Spencer complained to higher managers, including Deputy Plant Direct James O'Keefe that Green and the other mechanic had

put soap in the coffee maker.

24. Dana Spencer would regularly bump or knock into the other African American mechanic, and he loudly slams objects as varied as rolls of duct tapes, doors and computers, near Plaintiff and the other African American mechanic in an effort to intimidate them.

25. On January 14, 2016, Mr. Green met with Cesar Korzeniewicz, an employee of the Architect's Equal Employment Opportunity office (now known as the Diversity, Inclusion and Dispute Resolution office) to complain about the discriminatory treatment by Shaw, Coleman, Spencer and Barletta.

26. Although the Architect allowed employees such as Mr. Green to believe that Mr. Korzeniewicz was an EEO employee, in truth he was both an EEO investigator and an attorney in the Office of General Counsel, the office that defends the Architect in discrimination claims brought before the Office of Congressional Workplace Rights.  As such, Mr. Korzeniewicz learned about all claims of discrimination brought to the Architect's EEO Office and reported them directly to the General Counsel, which allowed the General Counsel to begin preparing managers to defend against claims early on.

27. On or about January 15, 2016, Mr. Shaw told the other mechanics that he was going to get rid of Mr. Green.

28. Mr. Green complained about the discriminatory harassment to which he was being subjected to Mr. Korzeniewicz again in February 2016.

29. The Architect did not engage in any investigation and took no corrective action based on Mr. Green's complaint.

30. Rather than investigate the discriminatory environment, the Architect sent the shop to some sort of team-building meeting, at which each member of the shop was asked to express

their feelings.  At that meeting, David Barletta exclaimed that Mr. Green was a "bad influence" on the other African American mechanic because Mr. Green is outspoken and speaks up when his colleagues and supervisors to mistreat him.

31. Mr. Green and the other African American mechanic were regularly required to perform jobs by themselves, whereas the white Maintenance Mechanics were always assigned to work in pairs.

32. Mr. Shaw assigned dirty and dangerous jobs to the African American Maintenance Mechanics.

33. In February 2017, Mr. Shaw assigned Mr. Green to remove a urinal Mr.  these included cleaning a toilet that was clogged with human waste, clearly a job for another trade. When the toilet could not be cleaned and had to be replaced, Mr. Shaw assigned Mr. Green to do so, by himself.  Mr. Green refused to do so because the urinal was very heavy and could not safely be lifted by one person, and it had again become full of human waste.

34. In April 2017, Mr. Shaw assigned Mr. Green to remove a heave steel shelf in a rat-infested shed that was on the power plant grounds.  Shaw originally assigned the task for Mr. Green to complete by himself, even though the shelf in question weighed hundreds of pounds.

35. In March 2017 Mr. Green and other employees at the AOC participated in a week-long event at the Phelps Vocational High School, wherein the AOC personnel would make presentations about the trades and employment at the AOC.  This was part of an annual event that the Architect participated in.

36.  Quinton Coleman (then the Mechanic Work Leader) and David Barletta, began a rumor that Mr. Green had falsified his participation in the event at Phelps Vocational High School. Instead, Mr. Coleman claimed that Mr. Green simply took the week off.  There was no

evidence for this claim, which was blatantly false. Indeed, Mr. Green had attended every day of the event, and had signed in on the daily register.  This event was of particular importance to Mr. Green because he was an alumnus of Phelps.

37. Mr. Green spoke to Mr. Coleman and asked him about the false claims that Mr. Coleman had made.  Mr. Coleman then reported Mr. Green to Vic Shaw and Randy Charity, claiming that Mr. Green had been confrontational.

38. The following day, Mr. Green was called into a disciplinary counseling meeting with Employee Relations Specialist Brandi Mehok, Victor Shaw, Randy Charity, and James Burch. Mr. Green explained that he was being subjected to discriminatory harassment and that he had not been confrontational, and that instead he had only attempted to convince Mr. Coleman to cease his discriminatory comments and conduct.

39. No action was taken against either Mr. Coleman or Mr. Barletta.

40. On one occasion, in April 2017, Mr. Barletta intentionally closed a freight elevator door (which closes from top to bottom and has no safety device to avoid closure) on Mr. Green's head, causing him a head injury which resulted in a week off of work.

41. Even though Randy Charity was present at the time and saw the incident, no action was taken against Mr. Barletta and the event was not even logged as a workplace injury.

42. In April 2017, Victor Shaw attempted to drive a wedge between the African American mechanics by telling the other African American mechanic that Mr. Green was a bad influence on him, only because Mr. Green was vocal in his defense against discriminatory treatment.

43. Shaw and Coleman engaged in this type of severe and/or pervasive conduct on at least a weekly basis over a period of several years between 2015 and July 2018.  Spencer and

Barletta's harassing conduct continues to the present.

44. After Mr. Shaw left the Architect in 2018, Randy Charity, who had been the Assistant Supervisor, was promoted to the Supervisor position, leaving the Assistant Supervisor position vacant for approximately 12 months.  Mr. Charity is African American, but he has not taken steps to protect other individuals from discrimination.

45. After Mr. Coleman left the Architect (also in 2018), when the Leader position was being filled, James O'Keefe (the Deputy Director of the Capitol Power Plant) told Mr. Green that he was not selected, or even interviewed, for the position because he was not qualified. On information and belief, this was incorrect, and Mr. Green was simply not selected to be interviewed because of his race.

46. Dana Spencer was promoted to the Leader position.

47. As a Work Leader, Mr. Spencer is responsible for assigning specific tasks to the maintenance mechanics, monitoring their work performance and project completion and advising the supervisor on how employees should be evaluated.

48. In the absence of an Assistant Supervisor Mr. Spencer was the Acting Supervisor in Randy Charity's absence and on Mondays when Mr. Charity is off of work for his Alternative Work Schedule day.

49. On May 10, 2019, when Mr. Green was assigned to inspect the ladders in the Power Plant, an assignment that Mr. Spencer would have been aware of, Mr. Green found a noose hanging from one of the ladders.

50. Mr. Green showed the noose to Supervisor Randy Charity, who photographed the noose on his work telephone and then someone removed it.

51. On information and belief, Mr. Charity and Mr. Burch both knew that Mr. Spencer

8

had hung the noose because Mr. Spencer was the only one who knew that Mr. Green would be assigned to ladder inspection and Mr. Spencer hung the noose on the ladder where Mr. Green was sure to find it.

52. The Architect did not undertake any investigation to determine who had hung the noose, nor was any discrimination training given to the shop.

53. Also, on or about May 21, 2019, another mechanic told Mr. Green and the other African American mechanic that Mr. Spencer was threatening to "beat" the other African American maintenance mechanic's "ass." The other mechanic reported the threat to Mr. Charity, Aaron Redmond and James Burch, but no substantive action was taken against Mr. Spencer and no thorough investigation occurred.

54. On or around June 5, 2019 another maintenance mechanic told Mr. Green that, for years, Mr. Spencer had regularly referred to Mr. Green as well as the other African American maintenance mechanic and Randy Charity as "niggers."

55. On June 6, 2019 Mr. Green reported Mr. Spencer's racist statements and threat of violence against the other African American mechanic to Randy Charity and James Burch.

56. Despite the May 21 and June 6, 2019 complaints, Mr. Spencer was not placed on administrative leave and no investigation was commenced immediately.

57. Following plaintiff's complaint and the complaint of the other African American mechanic, Mr. Spencer assigned the other mechanic to work by himself on the roof of the power plant for three straight days on one of the hottest stretches of the summer.

58. On July 8, 2019, Mr. Green was speaking to his wife on the telephone about arranging for their son to get new eyeglasses. Mr. Spencer approached Mr. Green and began speaking. When Mr. Green made a sign for patience, Mr. Spencer erupted saying that Mr. Green

"need[ed] to get off the phone and give me some fucking respect."

59. Mr. Spencer issued Mr. Green a disciplinary counseling memorandum as a result of the encounter on July 8, 2019.

60. Mr. Spencer reported Mr. Green to Mr. Charity and Mr. Redmond in an attempt by Mr. Spencer to discipline Mr. Green. Mr. Spencer also falsely accused Mr. Green of slamming into him while the two men were walking past each other in the hallway.  Both of these acts were designed to intimidate the African American maintenance mechanics from continuing to engage in protected activity and complain about discrimination.

61. Plaintiff and the other maintenance mechanics were finally interviewed by the AOC's Office of Diversity, Inclusion and Dispute Resolution on July 12, 2019, but it is unclear whether this investigation was tailored to Plaintiff's complaint about Mr. Spencer or whether it was a workplace environment survey.

62. Mr. Spencer remained on active duty as the Mechanic Leader until the end of August 2019, when he was placed on administrative leave.  On information and belief Mr. Spencer remains on paid administrative leave until the present.

63. There is no indication that Mr. Spencer was placed on administrative leave because of his discriminatory conduct toward Mr. Green or the other African American employees in the Mechanic Division.

64. In approximately September or October 2019, the Defendant selected another Maintenance Mechanic Assistant Supervisor, Jason Fuentes.

65. Mr. Fuentes is very friendly with David Barletta, one of the mechanics who has engaged in discriminatory conduct toward Plaintiff.

66. Shortly after beginning in his role as Assistant Supervisor Mr. Fuentes began taking

an overtly hostile attitude toward Plaintiff and treating Plaintiff like a "problem employee."

67. For example, on October 28, 2019, Plaintiff left the power plant for appointments at the Rayburn and Ford House Office Buildings.  For no reason, Mr. Fuentes decided to monitor Mr. Green's departure and return (as if Mr. Green had a history of abusing time and attendance), and he demanded that Mr. Green telephone him immediately upon returning to the power plant after the medical surveillance exam.

68. Upon Mr. Green's return to the power plant, Mr. Fuentes was waiting for him in the parking lot.  As Mr. Green pulled into a parking space, Mr. Fuentes was angrily gesticulating and demanding to know why Mr. Green had not called him, since Fuentes had instructed him to call when he returned.  Mr. Green responded that Mr. Fuentes had not given him that opportunity to call, in light of the fact that Mr. Green had only just then returned.

69. On October 31, 2019, Mr. Fuentes repositioned Mr. Green's computer desk (as well as that of two other mechanics) so that the mechanic's back would be facing the door and so that their computer screens were visible from the window in the door to the room.  All three mechanics moved their desks back to the original position, so that they were facing the door when they sat and so that the computer screens were not visible to the world.

70. On November 1, 2019, Mr. Fuentes had no problem with the other two mechanics returning their desks as they were, but when it came to Mr. Green, Fuentes made a point of loudly stating that he was the supervisor now and that if he had moved the desks it was for a reason and that Green was not to move anything from the way that Fuentes had adjusted things.

71. Mr. Green raised his concerns about Mr. Fuentes' treatment of him to James Burch on both October 28, 2019 and November 1, 2019.

72. On November 7, 2019, Mr. Fuentes chastised Mr. Green for having complained to

Mr. Burch. Mr. Green responded that Mr. Fuentes was singling him out among the other mechanics and that management had taken action against other supervisors for similar discriminatory conduct.

73. Shortly thereafter, Mr. Fuentes reported Mr. Green to James Burch and Randy Charity, allegedly for threatening Mr. Fuentes' job.

74. In a subsequent conversation with Mr. Burch and Mr. Charity, Mr. Green stated that he felt as though Mr. Fuentes was about to take action against him for no reason.  Mr. Burch responded: "I don't know what Mr. Fuentes is doing," and cautioned Mr. Green that sometimes supervisors can take action against an employee because of a misunderstanding over something the employee has said, and cautioned Mr. Green to be careful when he speaks to supervisors.

75. On November 13, 2019, Mr. Charity ordered Mr. Green to perform a dangerous job by himself, in a remote part of the plant where other employees rarely go, and without appropriate safety precautions.  The assignment was to repack the seals on an access panel that was situated approximate high above the ground, using a 6-foot ladder and squeezing in the two-foot space between an asbestos covered pipe and the access panel itself.  All this of course was to be done alone and without a proper asbestos-protection suit.

## COUNT I: HOSTILE WORK ENVIRONMENT BASED ON RACE AND RETALIATION

76. Plaintiff repeats and reavers each of the foregoing paragraphs as if they were specifically restated here.

77. Plaintiff repeatedly engaged in protected activity under the Congressional Accountability Act (as amended), including January and February 2016 when he met with Mr. Korzeniewicz to complain about Shaw, Coleman, Spencer and Barletta, March 2017 when he met with Burch, Mehok, Charity and Shaw and complained about Coleman's discriminatory

conduct, May 2019 when Mr. Green complained to Mr. Charity and Mr. Burch about the noose, June 6, 2019 when he complained about Mr. Spencer's racial slurs and threats of violence to Mr. Charity and Mr. Burch, July 12, 2019 when he participated in the DIDR investigation into the discriminatory work environment and November 2019 when he complained to Mr. Charity and Mr. Burch about Mr. Fuente's harassing conduct and targeting him because of discrimination.

78. All of the foregoing hostile conduct recounted in paragraphs 15-75 formed a continuous and unitary hostile work environment that was based on either Plaintiff's race (African American) or his protected activity (including his complaints to the EEO office in 2016, his repeated complaints to James Burch and other managers over the years, and his participation in the DIDR investigation in July 2019.

79. The Architect is strictly liable for the discriminatory and retaliatory hostile work environment imposed by Mr. Green's supervisors, including Mr. Shaw, Mr. Spencer, Mr. Coleman and Mr. Fuentes.

80. The Architect knew about the discriminatory and retaliatory hostile work environment created (or strengthened) by employees such as David Barletta and any other employees who are considered non-supervisory.

81. The Architect failed to take prompt action to address the discrimination and harassment against Mr. Green when it learned about the conduct through Mr. Green's own complaints.

82. As a result of the Architect's failure to act, the Architect endorsed the hostile conduct and encouraged it to continue under different supervisors and employees, as explained above.

83. The hostile conduct described herein at the hands of Plaintiff's supervisors and AOC management followed (at least in part) Plaintiff's protected activity, and it was "materially

adverse" in that it was sufficient to dissuade a reasonable employee from engaging in protected activity.

84. The hostile work environment alleged herein was additionally severe and/or pervasive enough to alter the terms and conditions of Plaintiff's employment, and it was targeted at Plaintiff because of his race (African American) and/or his protected activity.

85. As a result of the AOCs unlawful conduct, Plaintiff has suffered emotional pain and suffering, stress, fear, embarrassment, humiliation, inconvenience, feelings of depression and anxiety and fear of losing his job.

86. As examples of the emotional toll the hostile conduct has taken on him, Mr. Green frequently takes the day off when Randy Charity is absent or on his AWS day, and Mr. Green typically eats his lunch alone in his car rather than in the break room with the white mechanics and supervisors who have tormented and harassed him.

WHEREFORE, Plaintiff prays that this Court: (i) declare that the employment practices complained of in this Complaint are unlawful in that they violate the Congressional Accountability Act; (ii) permanently enjoin the Defendant and its agents, officers and employees from engaging in all practices found by this Court to be in violation of the Congressional Accountability Act; (iii) order the Defendant to make the Plaintiff whole by paying him any monetary damages proved at trial in addition to compensatory damages in an amount to be determined at trial; (iv) retain jurisdiction over this action to ensure full compliance with the Court's orders and require the Defendant to file such reports as the Court deems necessary to evaluate such compliance; (v) order the Defendant to pay Plaintiff's costs and expenses and reasonable attorneys' fees in connection with this action; and (vi) grant such other and further relief to the Plaintiff as the Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY**

Respectfully Submitted,
ALDERMAN, DEVORSETZ & HORA, PLLC

Leslie D. Alderman III (D.C. # 477750)
1025 Connecticut Ave., NW
Suite 615
Washington, DC 20036
Tel: 202-969-8220
Fax: 202-969-8224
lalderman@adhlawfirm.com
Attorney for the Plaintiff